## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____
                                :
DENZEL MORRISON,                :
                                :
              Plaintiff,        :          Hon. Dennis M. Cavanaugh
                                :
       vs.                      :          **OPINION**
                                :
JO ANNE B. BARNHART             :
COMMISSIONER OF SOCIAL          :          Civil Action No.: 05-3426
SECURITY,                       :
                                :
              Defendant.        :
_____:

DENNIS M. CAVANAUGH, U.S.D.J.

       This matter comes before the Court upon the application of Plaintiff Denzel Morrison

("Plaintiff"), by his mother Stacy Morrison, to overturn the final determination of Jo Anne B.

Barnhart, the Commissioner of Social Security (the "Commissioner"), denying Plaintiff's request

for Supplementary Security Income benefits ("SSI") under the Social Security Act (the "Act").

The Court has jurisdiction to review this matter pursuant to 42 U.S.C. §§ 405(g) and 1383 (c)(3).

This matter is decided without oral argument pursuant to Rule 78 of the Federal Rules of Civil

Procedure.  For the foregoing reasons, the final decision of the Commissioner is **affirmed**.

## I.  BACKGROUND

### A. Procedural History

       Plaintiff, alleging disability, filed an application for Child's SSI on February 11, 2003.

(Tr. at 43 ).  His claim was denied initially and on reconsideration. (Tr. at 25-27, 30-32).  At

Plaintiff's request, a hearing was held on May 6, 2004 before an Administrative Law Judge

("ALJ").  (Tr. at 34).  In a decision dated July 27, 2004, the ALJ found Plaintiff not to be

disabled within the meaning of the Act.  (Tr. at 14-21).  On May 9, 2005, the Appeals Council

denied Plaintiff's request for review, at which time the ALJ's decision became the final decision

of the Commissioner.  (Tr. at 4-6).  Plaintiff now appeals to this Court.

## B.  Factual History

### 1.  Medical Records Relating to Plaintiff's Physical and Emotional Injury

Plaintiff suffers from osteochondromas, a hereditary condition causing multiple bony

bulges, referred to as exostoses, to protrude from his body on his legs, head, and ribs.  (Tr. at 94).

Beginning in 1998, Plaintiff sought treatment every two months from his physician, Dr. Fouad

Rasheed, for local pain and joint movement restriction.  (Tr. at 94, 101).   Pain ensued whenever

the exostoses grew to a certain size or pressed against a nearby vein.  (Tr. at 51). To relieve the

pain, Plaintiff has received physical therapy, rest, alcohol rubs, over the counter medication, and

prescription analgesics.  (Tr. at 52, 54, 81, 102).   On February 22, 1996, he underwent surgery in

order to excise exostoses protruding from his femurs.  (Tr. at 87-93).   However, a chronic limp in

his gait resulted from the surgery.  (Tr. at 155).  Since that time, despite varied treatments, the

exostoses have continued to grow and appear on new parts of his body.  (Tr. at 95).

Plaintiff also suffers from bronchial asthma exacerbations.  (Tr. at 94).  After presenting

to Dr. Rasheed on September 30, 2002 and April 23, 2003, with severe asthma, Plaintiff was

prescribed nasal corticosteroids.  (Tr. at 103).  On June 3, 2003, Plaintiff presented with similar

symptoms and was prescribed oral prednisone, a corticosteroid nasal inhaler, bronchodilator

medication and antibiotics.  (Tr. at 101-103).  Plaintiff did not visit the emergency room for

asthma-related symptoms, nor did he experience any growth deficits due to his asthmatic

condition.  (Tr. at 97, 107).  Further treatment for his asthma consisted of using an inhaler before

gym class at school and at home when needed.  (Tr. at 49, 77).  Plaintiff also owned a Nebulizer

which he used occasionally when he had trouble breathing.  (Tr. at 149).

Plaintiff has been diagnosed with reactive depression to his chronic illness and is a patient

at the Institute for Behavioral Health Services' Child and Family Services Unit.  (Tr. at 95, 117).

He periodically exhibits a depressed mood, blunted affect, restlessness, episodic anger, and a

soft-spoken nature.  (Tr. at 120-134).  Plaintiff was prescribed Zoloft by Dr. Bindu Khanna,

which was discontinued shortly thereafter by Plaintiff's mother due to a belief that the

medication was ineffective.  (Tr. at 79, 123, 126).   He sporadically attended psychotherapy

sessions with Dr. Brigitte Kelly beginning in 2003.  (Tr. at 125-126, 129, 131, 134).   During

these sessions, Plaintiff and his mother discussed daily concerns, such as receiving a "C" in class

or Plaintiff's anger directed toward his sister for annoying his mother.  (Tr. at 120-121).  Dr.

Kelly observed that Plaintiff's mother's own personal issues significantly impacted Plaintiff's

emotional state.  (Tr. at 121).  On multiple occasions, Dr. Kelly engaged Plaintiff through

drawing and games, such as chess and air hockey.  (Tr. at 128-130).  Plaintiff's most recently

visited a psychiatrist on August 7, 2003; his last visit to a social worker intern occurred in June

2004.  (Tr. at 134).

Plaintiff received special, handicap bus transportation to school.  (Tr. at 64, 157).  He was

given a special elevator key which allowed him to avoid using the stairwell.  (Tr. at 157).  A

teacher questionnaire, completed by Maris Drago on March 4, 2003, indicated that Plaintiff did

not have any difficulty in acquiring and using information, attending and completing tasks,

interacting and relating with others, or caring for himself.  (Tr. at 58-63).[1]  Nevertheless, Ms. Drago noted that Plaintiff was unable to participate in normal school fire drills; rather, he was called to the office to exit the building from the first floor instead of exiting with class on the second floor.  (Tr. at 62).  Moreover, Plaintiff  took Albuterol before participation in "partial gym" in order to treat his asthma.  (Tr. at 64, 66, 149-150).

School records revealed habitual absences and tardiness.  (Tr. at 83-84).  It was indicated in the teacher questionnaire that the absences were the product of pain caused by exostoses.  (Tr. at 64).  Plaintiff missed two months and eighteen days[2] of school during the preceding and current school years, respectively.  (Tr. at 84, 144, 158).  He received home schooling during some of these absences in order to remain "on level for class."  (Tr. at 107, 142, 160).  The school was in the process of considering obtaining special tutoring due to Plaintiff's frequent absences.  (Tr. at 64).

On August 27, 2003, the Disability Determination Service ("DDS") filed a "Childhood Disability Evaluation Form" with the Social Security Administration indicating that it believed Plaintiff's impairment, or combination of impairments, were severe, but did not meet the medical or functional equivalent to those impairments listed in the Act.  (Tr. at 111-116).  The DDS did not find any limitation regarding Plaintiff's ability regarding "Acquiring and Using Information,"

---

[1]State Agency consultative physician J. Chinitz agreed with this assessment in a childhood disability evaluation dated July 14, 2003.  (Tr. at 113).  Dr. Chinitz concluded that, although Plaintiff suffered from exostoses, he did not have an impairment, or combination of impairments, which were equivalent to the Act's listed impairments.  (Tr. at 111).  Dr. Chinitz's assessment was affirmed by Dr. Radharani Mohant on August 27, 2003.  (Tr. at 112).

[2]Plaintiff's mother supplemented the record on May 12, 2004 indicating that Plaintiff had been absent from school on May 11 and 12.  (Tr. at 84)  These absences were preceded by sixteen prior absences in the 2003-2004 school year.  (Tr. at 158).

"Attending and Completing Tasks," "Interacting and Relating with Others," and "Caring for Yourself." (Tr. at 113-114). It determined that Plaintiff's limitations in "Moving About and Manipulating Objects" and "Health and Physical Well-Being" were less than marked. (Tr. at 114).

### 2. Plaintiff's Mother's Testimony

Plaintiff's mother testified regarding her son's physical and mental condition at a hearing held on May 6, 2004. (Tr. at 143-162). She stated that Plaintiff was in seventh grade, his first year in junior high school. (Tr. at 144-145). His grades were adequate, but "a little low this quarter." (Tr. at 144). She also testified that Plaintiff's onset of pain was unpredictable, could last up to two to three hours at a time, and was difficult to treat through pain medication. (Tr. at 145-146, 156). Although he had been prescribed Tylenol with Codeine, this prescription was unrelated to Plaintiff's exostoses; rather, it was prescribed by Plaintiff's dentist due to a prior root canal. (Tr. at 146-147). Most often, Plaintiff's pain was treated with extra strength Tylenol. (Tr. at 147).

Plaintiff underwent surgery when he was five years old to remove protruding bones, caused by exostoses, from both legs. (Tr. at 160). Plaintiff's mother briefly considered further surgery; however, the option ultimately was rejected due to the possibility of complications which may have led to amputation. (Tr. at 161).

Plaintiff's mother testified that Plaintiff did not seek emergency assistance to treat his exostoses or asthma. (Tr. at 147). She explained that when Plaintiff experienced any difficulty breathing, he used his Nebulizer. (Tr. at 149). At the time of the hearing, he had suffered one extensive asthma attack that year requiring the use of the Nebulizer. (Tr. at 150-151).

Plaintiff's mother further testified that her son did not have many friends and rarely would leave the house due to embarrassment regarding his bone disease. (Tr. at 151, 153). She stated that Plaintiff would avoid social situations because he was unsure how to respond to children questioning him about his disease. (Tr. at 153). Rather, he would often shut himself in his room and play video games in the dark. (Id.) Plaintiff did not like to ride the handicap bus to school because his friends would make fun of him. (Id.) Despite his mother's wishes to the contrary, Plaintiff often walked home from school so that he would not have to ride the bus. (Tr. at 173).

Plaintiff did not get along with his younger sister and would "shut out" his mother. (Tr. at 153-154). He was unresponsive to his mother's attempts to talk to him about his physical and emotional well-being. (Tr. at 153). So as to help Plaintiff manage his embarrassment, anger, and depression, Plaintiff's mother obtained psychotherapy treatment for him. (Tr. at 151-152). However, she indicated that therapy sessions were frequently missed and rescheduled and that Plaintiff was no longer taking the prescribed antidepressant medication. (Tr. at 152-153).

### 3. Plaintiff's Testimony

At the hearing held on August 17, 2004, Plaintiff described his physical and mental condition. (Tr. at 162-175). He testified to his difficulty in walking due to the severe pain resulting from exostoses in his shin, ankles, and knee. (Tr. at 163-164). Plaintiff depicted the bony protrusions as looking like giant tennis balls. (Tr. at 165-166). Whenever he felt pain, Plaintiff would have to stop what he was doing for a few hours. (Tr. at 166). He would, at times, be woken up at night by the pain. (Tr. at 168). If pain occurred at school, he would go to the nurse's office and the school often would send him home. (Tr. at 167).

Plaintiff testified that he always participated in gym class and would play basketball, volleyball, and baseball. (Tr. at 169). He was not restricted in any way, nor was he excused from participating. (Id.) Although he was supposed to use his inhaler before gym, Plaintiff admitted that he did not. (Tr. at 171). Plaintiff was given permission to ride the elevator at school so that he did not have to walk up the stairs. (Tr. at 172). He participated in certain extracurricular school activities, including membership in the school's student council. (Tr. at 170). After school, he sometimes would play outdoor football with his new friends. (Tr. at 171).

### 4.  The Decision of the ALJ

The ALJ determined Plaintiff was not disabled within the meaning of the Act and, therefore, denied his application for disability benefits. (Tr. at 14-21). Since Plaintiff was not engaged in substantial gainful activity, the ALJ evaluated the medical evidence. (Tr. at 15). He accorded "reasonable benefit of the doubt to the child" and labeled Plaintiff's medical impairments as severe, thereby justifying the sequential evaluation. (Tr. at 17). The ALJ noted that a listing did not exist in the Act which specifically covered exostoses. (Id.) However, similar sections did refer to a "major dysfunction of a joint," "fracture of the femur, tibia, pelvis or one or more of the tarsal bones," and "fracture of an upper extremity." (Id.) These sections directed the ALJ to consider difficulty the complainant experienced in ambulating and performing fine and gross movements, and also the lack of major functions of an upper extremity. (Id.) In his decision, the ALJ noted that although Plaintiff had exhibited some difficulty walking, he generally participated in gym class and frequently walked home from school. (Id.) Therefore, the ALJ concluded that Plaintiff's activities did not meet the listing-level of dysfunction associated with the listings most similar to exostoses. (Id.)

7

Furthermore, the ALJ evaluated Plaintiff's asthmatic condition and determined that it did not meet the appropriate level of dysfunction for asthma as proscribed by the Act. (Tr. at 17). The absence of pulmonary function testing, chronic wheezing, emergency room visits, inpatient hospitalization, or intensive treatment, such as intravenous antibiotics or extensive inhalation therapy, was noted to detract credibility from Plaintiff's claims of total disability. (Id.)

The ALJ then considered Plaintiff's reactive depression/dysthymic disorder and concluded that he did not have a full depressive syndrome. (Tr. at 18). The ALJ identified certain behaviors, including interest in school work, enjoyment when playing video games, attraction to new board games, lack of depressive symptoms, absence of appetite or sleep disturbance, lack of difficulty concentrating, no loss of energy, and no suicidal thoughts as factors demonstrating that Plaintiff did not meet the extent of mental functioning limitation to satisfy the appropriate listing. (Id.)

The ALJ went on to determine that Plaintiff did not have "marked impairment" in age-appropriate cognitive/communicative function. (Tr. at 18). He noted that Plaintiff, despite numerous absences, was at the age-appropriate grade. (Id.) Additionally, his mother reported that his grades were "fine." (Id.) At his initial mental evaluation, Plaintiff was observed to be oriented and capable of appropriate thought process. (Id.) The ALJ identified inconsistencies in Plaintiff's behavior and concluded that he did not exhibit "marked impairment" in age-appropriate social functioning. (Id.) Although Plaintiff was soft-spoken, embarrassed by his impairment, and often liked to be left alone in his room, the fact that he was on student council, got along well with his mother's male companion and enjoyed learning new games revealed a less then "marked impairment" in social functioning. (Id.) The ALJ also did not find "marked

impairment" in age-appropriate personal functioning or significant restriction of activities of daily living due to depression.  (Id.)  Plaintiff cared to his grooming, was provided transportation to school and given other accommodations, came willingly to therapy sessions, and was able to calm down when he played with his cat and video games.  (Tr. at 18-19).  The ALJ found neither difficulty concentrating nor mental decompensation. (Id.)

The DDS opined that Plaintiff's exostoses and asthma did not satisfy medically equal listings and supported its position by referring to the "child's clinical signs and symptoms, as well as the treatment the child has received, regarding the physical impairments." (Tr. at 19). DDS noted that Plaintiff's impairments were not equivalent to the listed impairments since he was only limited in the areas of "Moving About and Manipulating Objects" and "Health and Physical Well-Being."  (Tr. at 20).  However, in these domains, the child demonstrated "less than marked limitations."  (Id.)  The ALJ noted that the DDS determination should be accorded substantial weight since it was a reasonable conclusion based upon the evidence before them and new evidence, concerning either Plaintiff's physical or mental impairments, was "not materially different regarding the functional equivalence."  (Tr. at 19-20).

After analyzing and weighing the evidence before him, the ALJ stood by the DDS determination and concluded that Plaintiff's combination of medically determinable impairments did not cause any limitation in "Acquiring and Using Information," "Attending or Completing Tasks," or "Caring for Yourself."  (Tr. at 20).  Plaintiff also demonstrated less than the required marked limitation regarding "Interacting and Relating with Others," "Moving About and Manipulating Objects," and "Health and Physical Well-Being."  (Id.)  Accordingly, the ALJ determined that, given the absence of extreme limitation in any domain or marked limitation in

9

two domains, Plaintiff did not have an impairment, or combination of impairments, which became the functional equivalent of any of the impairments listed in the Act and, therefore, did not have a "disability."  (Id.)

## II.  DISCUSSION

### A.  Standard of Review

A claimant is entitled to benefits under the Act only if he satisfies all relevant requirements of the statute.  To establish a valid claim for disability insurance benefits and SSI benefits, the claimant must meet the insured status requirements of 42 U.S.C. § 423(c) and the income and resource limitations of 42 U.S.C. §§ 1382(a) and 1382(b), respectively. Furthermore, for the purposes of both benefits, the claimant must demonstrate that he was disabled within the meaning of the Act.  A reviewing court must uphold the Commissioner's factual decisions if they are supported by "substantial evidence."  42 U.S.C. §§ 405(g), 1383(c)(3); Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992), cert. denied sub nom. Williams v. Shalala, 507 U.S. 924 (1993).  "Substantial evidence" means more than "a mere scintilla."  Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Id.  Some types of evidence will not be "substantial."  For example:

> [a] single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence.  Nor is evidence substantial if it is overwhelmed by other evidence – particularly certain types of evidence (e.g. that offered by treating physicians) – or if it really constitutes not evidence but mere conclusion.

Wallace v. Sec'y of Health & Human Servs., 722 F.2d 1150, 1153 (3d Cir. 1983) (quoting Kent

v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983)).  The ALJ must make specific findings of fact to support his ultimate conclusions.  Stewart v. Secretary of HEW, 714 F.2d 287, 290 (3d Cir. 1983). "Where the ALJ's findings of fact are supported by substantial evidence, the [reviewing court] is bound by these findings, even if [it] would have decided the factual inquiry differently." Fargnoli v. Massanari, 247 F.3d 34, 35 (3d Cir. 2001).  Thus, substantial evidence may be slightly less than a preponderance.  Stunkard v. Sec'y of Health & Human Servs., 841 F.2d 57, 59 (3d Cir. 1988).

"The reviewing court, however, does have a duty to review the evidence in its totality." Schonewolf v. Callahan, 972 F. Supp. 277, 284 (D.N.J. 1997) (citing Daring v. Heckler, 727 F.2d 64, 70 (3d Cir. 1984)).  In order to review the evidence, "a court must 'take into account whatever in the record fairly detracts from its weight.'" Id. (quoting, Willibanks v. Sec'y of Health & Human Servs., 847 F.2d 301, 303 (6th Cir. 1988)).  The Commissioner has a corresponding duty to facilitate the court's review: "[w]here the [Commissioner] is faced with conflicting evidence, he must adequately explain in the record his reasons for rejecting or discrediting competent evidence." Ogden v. Bowen, 677 F. Supp. 273, 278 (M.D. Pa. 1987) (citing Brewster v. Heckler, 786 F.2d 581 (3d Cir. 1986)).  As the Third Circuit has held, access to the Commissioner's reasoning is indeed essential to a meaningful court review:

> Unless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.

Gober v. Matthews, 574 F.2d 772, 776 (3d Cir. 1978) (quoting, Arnold v. Sec'y of Health, Educ. & Welfare, 567 F.2d 258, 259 (4th Cir. 1977)).  "[The reviewing court] need[s] from the ALJ not

only an expression of the evidence []he considered which supports the result, but also some indication of the evidence which was rejected." Cotter v. Harris, 642 F.2d 700, 705 (3d Cir. 1981). Without such an indication by the ALJ, the reviewing court cannot conduct an accurate review of the matter; the court cannot determine whether the evidence was discredited or simply ignored. See Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (citing, Cotter, 642 F. 2d at 705); Walton v. Halter, 243 F.3d 703, 710 (3d Cir. 2001). "The district court ... is [not] empowered to weigh the evidence or substitute its conclusions for those of the fact-finder." Williams, 970 F.2d at 1182 (citing, Early v. Heckler, 743 F.2d 1002, 1007 (3d Cir. 1984)).

### B.  Determining Disability in Children

The SSI program provides benefits to individuals who meet certain statutory income and resource limitations. 42 U.S.C. § 1381. For children seeking SSI due to disability, the statute states:

> [a]n individual under the age of 18 shall be considered disabled for the purposes of this title if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 1382c(a)(3)(C)(i). Thus, plaintiffs seeking SSI must show: (1) a medically determinable physical or mental impairment; (2) marked and severe functional limitations; and (3) both of the previous elements for a continuous period not less than twelve months. Id.

The Commissioner's regulations defines "marked and severe functional limitations" sufficient to show childhood disability in terms of Listing-level severity. 20 C.F.R. §§ 416.902, 416.906, 416.926a(a). In addition, the Commissioner utilizes a sequential evaluation process in order to determine childhood disability. 20 C.F.R. § 416.924. First, the Commissioner

determines whether the child is engaged in substantial gainful activities.  Second, the Commissioner must decide whether the child has a "severe" impairment or combination of impairments.  Finally, the Commissioner decides whether the child's impairment is of Listing-level severity.  Id.  If a child's impairment, or combination of impairments, equals a listed impairment, he will be found disabled.  20 C.F.R. § 416.926.  If a child's impairment does not equal an impairment contained in the Listing of Impairments, the Commissioner will assess all functional limitations caused by the child's impairments.  20 C.F.R. § 416.926a. If the functional limitations caused by the child's impairment are equivalent to the functional limitations of a listed disability, the child will be found disabled.  Id.

In order to make this determination, the Commissioner will consider how the child functions in his activities with regards to six domains:

(i) Acquiring and using information;
(ii) Attending and completing tasks;
(iii) Interacting and relating with others;
(iv) Moving about and manipulating objects;
(v) Caring for yourself; and,
(vi) Health and physical well-being.

20 C.F.R. § 416.926a(b)(1)(i-vi).  A medically determinable impairment or combination of impairments functionally equals a listed impairment if it results in "marked" limitations in two of the aforementioned domains or an "extreme" limitation in one domain.  20 C.F.R. § 416.926a.  A limitation is "marked" if it seriously interferes with the child's ability to independently initiate, sustain, or complete activities.  20 C.F.R. § 416.924a(e)(2).  An "extreme" limitation is "more than marked."  § 416.924a(e)(3).  This adjective describes the very worst limitations.  Id.  Thus, in order to warrant a disability determination, a child's functional limitations must be more than moderate

13

in at least two domains.  § 416.924a(e)(2).

### C.  The Record Must Provide Objective Medical Evidence

Under the Act, proof of a disability requires objective medical evidence.  "An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Secretary may require."  42 U.S.C. § 423(d)(5)(A). Additionally, "[a]n individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability as defined in this section."  Id.  Specifically, a finding that one is disabled requires:

> medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities which could reasonable be expected to produce the pain or other symptoms alleged and which, when considered with all evidence required to be furnished under this paragraph . . . would lead to a conclusion that the individual is under a disability.

Id.; see 42 U.S.C. § 1382c(a)(3)(A) (defining a disabled person as one who is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . .").  Furthermore, S.S.R. 96-7p provides that:

> [t]he adjudicator must evaluate the intensity, persistence and limiting effects of the [claimant's] symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work-related activities. To do this, the adjudicator must determine the credibility of the individual's statements based on consideration of the entire case record. The requirement for a finding of credibility is found in 20 C.F.R. § 404.1529(c)(4) and § 416.929(c)(4).

Nevertheless, a claimant's symptoms, "such as pain, fatigue, shortness of breath, weakness, or nervousness, will not be found to affect . . . [one's] ability to do basic work activities unless medical signs or laboratory findings show that a medically determinable impairment(s) is

14

present." 20 C.F.R. § 404.1529(b); <u>see</u> <u>Hartranft v. Apfel</u>, 181 F.3d 358, 362 (3d Cir. 1999) (rejecting claimant's argument that ALJ failed to consider his subjective symptoms where ALJ made findings that complaints of pain and symptoms were inconsistent with objective medical evidence and claimant's hearing testimony); <u>Williams</u>, 970 F.2d at 1186 (denying claimant benefits where claimant failed to proffer medical findings or signs that he was unable to work); <u>Green v. Schweiker</u>, 749 F.2d 1066, 1069-70 (3d Cir. 1984) (emphasizing that "subjective complaints of pain, without more, do not in themselves constitute disability").

### III. <u>ANALYSIS</u>

Plaintiff contends that the ALJ erred as a matter of law by (1) failing to support his decision with substantial evidence in the record; (2) failing to identify that Plaintiff's impairment were the medical equivalent of a Listed Impairment; and (3) failing to acknowledge that Plaintiff's impairments were functionally equivalent of a Listed Impairment. (Pl.'s Br. at 5-18). For the reasons set forth below, this Court disagrees and affirms the ALJ's decision.

With respect to Plaintiff's first contention, that the ALJ failed to support his decision with substantial evidence, this Court considers the ALJ's detailed analysis of the record to be appropriate. The ALJ stated numerous reasons for his assessment. He listed and evaluated the criteria and devoted significant attention to Plaintiff's claims. (Tr. at 15-20). The evaluation of the evidence included an analysis of Plaintiff's course of treatment, past medical history, living situation and relationship with his family, notes of Plaintiff's therapy sessions, behavior at school, ability to interact with teachers and friends, and intellectual functioning. (<u>Id.</u>) The ALJ considered every medical opinion available. (<u>Id.</u>)

15

The ALJ addressed each of the six domains of human growth when he considered if Plaintiff's condition was the functional equivalent to a Listed Impairment.  (Tr. at 18-19).  He recognized that Plaintiff was, in fact, impaired in two domains; however, certain evidence and testimony statements in the record did not support, and sometimes contradicted, a finding of either extreme or marked limitation.  (Tr. at 19).  Regarding domains in which he did not consider Plaintiff limited, the ALJ identified factors that restricted Plaintiff but explained why these factors were not sufficient to demonstrate a finding of limitation.  (Tr. at 18).   The ALJ also considered Plaintiff's impairments in combination.  (Tr. at 19-21).  He acknowledged that Plaintiff's history of depression, when combined with his medical history of exostoses and asthma, was insufficient to negate DDS's medical opinion.  (Tr. at 19).

Plaintiff further argues that his impairment is the medical equivalent of Medical Listing 101.03 - a "deficit of musculoskeletal function due to deformity or musculoskeletal disease."  (20 C.F.R. 404, Subpart P, Appendix 1, Paragraph 101.03; Pl.'s Br. at 9).  However, to satisfy this listing, the impairment must markedly restrict walking in speed or distance "despite orthotic or prosthetic devices."  Plaintiff cannot fulfill this requirement since evidence in the record (Plaintiff walks home from school, participates in gym class, and plays football outside) demonstrates that his ability to walk is not significantly curtailed.  Plaintiff asserts that his participation in gym was encouraged by the school system and existed primarily as "an attempt to integrate disabled children with their healthy peers."  (Pl.'s Br. at 12).  However, this motive was not mentioned anywhere in the record, either by school officials or Plaintiff himself.  Nor does this rationale explain why, if Plaintiff was severely restricted, he played football away from school supervision.  The ALJ considered the evidence before him and was not required, nor

16

would he have been allowed, to make assumptions as to why Plaintiff participated in gym class. See Hargenrader v. Califano, 575 F.2d 434, 439 (3d Cir. 1978). Had he done so, the decision would not have been based on substantial evidence since the record did not support that assumption. See id. Therefore, the rejection that Plaintiff's impairment was the medical equivalent to Medical Listing 101.03 was appropriate since his symptoms were not of equal medical significance to the required criteria. See 20 C.F.R. § 416.926b(1)(ii).

Finally, Plaintiff argues that his condition is the functional equivalent of a Listed Impairment. (Pl.'s Br. at 15-18). Specifically, he contends that his condition satisfies the legislative requirement that the complainant exhibit marked limitations in more than one domain. (Pl.'s Br. at 16). Plaintiff asserts that he suffers from a marked limitation regarding the domains of "Caring for One's Self," "Moving About and Manipulating Objects," and "Health and Physical Well Being." (Id.) The ALJ carefully examined each domain and recognized that Plaintiff did indeed have certain limitations. (Tr. at 17-20). However, the ALJ also noted that certain evidence, such as Plaintiff's ability to self-cope and that he did not have any difficulty caring for himself, demonstrated no limitation in his ability to care for himself. (Tr. at 19). Although the ALJ considered that Plaintiff rode a handicap bus to school, had a special elevator key and had a separate protocol for fire drills, he also acknowledged that Plaintiff was capable of walking home, engaging in sporting activities and playing video games. (Tr. at 17). The ALJ weighed the relevant evidence and concluded that Plaintiff's limitation in this domain was less than marked. (Tr. at 20). Finally, Plaintiff's physical well-being appropriately was determined not to be markedly limited since he enjoyed extra accommodations to attend school, received home tutoring when he was absent, did not receive any exostoses or asthma emergency treatment

17

over the past year, voluntarily decided to discontinue antidepressant medication, and his therapist noted that some of his problems existed due to factors outside of his physical health.  (Id.)  Since no domain was determined to be extremely or markedly limited, it was appropriate for the ALJ to conclude that Plaintiff's impairments, separately and in combination, were not the functional equivalent to a Listed Impairment.  In reaching his decision, the ALJ was not required to seek out further expert medical testimony.  See 20 C.F.R. § 416.927(f)(iii).

## IV. CONCLUSION

For the aforementioned reasons, the Court finds that the ALJ's decision was supported by substantial evidence in the record.  The decision of the Commissioner is **affirmed**.  An appropriate Order accompanies this Opinion.


                                               S/ Dennis M. Cavanaugh
                                               Dennis M. Cavanaugh, U.S.D.J.


Date:          August 3, 2006
Original:      Clerk's Office
Cc:            All Counsel of Record
               File